Filed 4/1/22  In re M.N. CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| In re M.N., a Person Coming Under the Juvenile Court Law. | H048489 (Santa Clara County Super. Ct. No. JD026270) |
| SANTA CLARA COUNTY DEPARTMENT OF FAMILY AND CHILDREN'S SERVICES, Plaintiff and Respondent, v. E.M., Defendant and Appellant. | |

On January 22, 2020, a young girl, M.N. (the minor), who was then 11 years old, was taken into protective custody after a reported domestic violence incident two days earlier.[1]  The minor had reported to the police on January 20 that her parents, E.M. (mother) and M.N. (father), had a domestic dispute at their San Jose home.  In the

---

[1] All dates are 2020 unless otherwise specified.

minor's presence, father verbally abused mother, struck her in the head, causing her to bleed, and discharged a firearm inside the home.[2]

The Santa Clara County Department of Family and Children's Services (Department) filed a petition under Welfare and Institutions Code section 300, subdivisions (a), (b)(1), (c), and (i).[3] The Department alleged that the minor's physical and emotional health was at risk due to the parents' ongoing domestic violence. The juvenile court ordered the minor detained. Mother subpoenaed the minor to testify at the contested jurisdiction/disposition hearing, and the minor filed a motion to quash the subpoena. After receiving briefs, the court granted the motion to quash in an order filed on July 13.

After a four-day contested jurisdiction/disposition hearing, on August 24, the juvenile court sustained the allegations of the petition under section 300, subdivisions (a), (b)(1), and (c), and it ordered the minor a dependent child to be placed into the care, custody, and control of the Department.

On appeal, mother challenges the juvenile court's order granting the minor's motion to quash. Mother argues that the juvenile court abused its discretion because it quashed the subpoena of the minor "without balancing the risk of psychological harm to [the minor] against the necessity for [her] testimony." We conclude that there was no error. We will affirm the order granting the motion to quash and the order after the jurisdiction/disposition hearing.

---

[2] The minor's older brother also bears the initials M.N. To distinguish the three family members, we will refer to the dependent child, M.N., as the minor, the father, M.N., as father, and the older brother, M.N., as M.N., Jr.

[3] Further statutory references are to the Welfare and Institutions Code unless otherwise stated.

# I.     FACTS AND PROCEDURAL HISTORY

## A.     Petition (January 2020)

On January 23, 2020, the Department filed a petition under section 300, subdivisions (a), (b) (1), (c), and (i) relative to the minor.  The Department alleged that on January 22, San Jose Police officers placed the minor in protective custody because she was at risk of physical and emotional harm and neglect in her parents' care because of the minor's exposure to ongoing domestic violence.  On January 20, "father perpetrated high-lethality-risk domestic violence in the family home in the child's presence" with actions consisting of calling mother names and punching her in the head, resulting in bleeding, pointing a loaded gun at mother, and firing two shots in the air inside the home.  The minor fled, hid in an alley, and called for assistance.  Mother transported father, a convicted felon on parole, to an unknown destination, leaving without knowing the minor's whereabouts or condition.  After being contacted by the police, mother denied any domestic violence, and she was cited for child endangerment.  The Department reported that "mother's choice [was] to protect the father rather than prioritize the child's safety and wellbeing."  At the time the petition was filed, father was continuing to evade an arrest warrant.

The Department advised that father had a lengthy history of domestic violence and aggressive and abusive behavior, and "the parents [had] repeatedly exposed [the minor] to this domestic violence in the family home."  Father kept firearms and ammunition in the home accessible to the minor.  "[B]oth parents minimize and deny the father's volatility and extreme violence and have failed to protect the child from chronic exposure to this violence."

It was alleged further that since the January 20 incident, mother had emotionally abused the minor by blaming her for calling the police.  She told the minor, " 'I'll never forgive you for this.  I hate you.' "

3

The Department advised in its initial hearing report that on January 20, the parents fled the home after the police were contacted, leaving the minor at home with the elderly paternal grandfather, who was blind and bedridden. Both parents were charged with child endangerment and neglect, and father was also charged with assault with a deadly weapon and possession of firearms/ammunition. Father was "at large and . . . deemed 'armed and dangerous.' "

The court ordered the minor detained on January 24. The court made findings that the Indian Child Welfare Act did not apply, and that the father, M.N., was the presumed father.

## B.  Jurisdiction/Disposition Report

The Department submitted a report in connection with the jurisdiction/disposition hearing in which it provided detail regarding the family's child welfare history from 2006; the police report of the January 20 incident; and its interviews with the minor, mother, father, and the minor's brother, J.N. It recommended that the court sustain the allegations of the petition, order that minor continue to remain in the custody, care, and control of the Department, and order that the parents receive family reunification services.[4]

### 1.  *Child Welfare History*

In a March 2006 referral, the minor's older brother, M.N., Jr., had told the reporting party that his parents fought in front of him, mother had grabbed the child by

---

[4] There appears to be a significant erroneous factual assertion in the opening brief, which is reiterated in the reply brief. Mother's counsel asserts that the Department initially recommended that services be bypassed for both parents, but the court later ordered that mother receive services and that services for father be bypassed. The record shows that the Department initially recommended in the jurisdiction/disposition report (stated three times) that both mother and father *receive* services. The Department later recommended that services for father be bypassed, but it was consistent in its recommendation that mother receive services.

his ear and pulled him to the floor, and on one occasion, father threw a pizza at mother. Both parents denied any domestic violence.

In a February 2007 referral, M.N., Jr. had told the reporting party that he had observed father hit mother on multiple occasions. When interviewed, M.N., Jr. told the social worker that his parents argued but he had not seen domestic violence in the home. The child said that mother had instructed him "not to tell anything about the 'bad things' that are happening in the home because he will be 'taken away to live with a new family.' " Mother denied there was domestic violence or that she and father fought in the children's presence.

In an October 2011 referral, the San Jose Police responded to a hospital concerning a reported domestic violence incident in which father had assaulted mother, causing her injuries, including a broken nose. The parents reported to the Department that they were separated and that the assault incident had not occurred in the presence of their children.

In a March 2012 referral, the reporting party indicated concerns that mother was neglecting her children. The reporting party stated that the children did not attend school regularly, mother did not bathe the children or change their clothes, and that the home was " 'filthy.' "

### 2. Police Report—January 20, 2020

According to a police report concerning the January 20, 2020 incident that was attached to the Department's report, the minor reported to responding officers that father had " '[y]ell[ed] and curs[ed] at her mother' " and had " 'called her a bitch and a slut." The minor said that father had pointed a gun at mother, " 'racked the slide back' and 'fired two shots inside the house.' " One shot was about 20 feet from the infirm paternal grandfather, and the other was fired at mother. The minor also stated to the police that father had struck mother with a closed fist, causing her to bleed.

5

Police located mother by telephone on January 20 and told her the minor was safe and with the police in San Jose. When asked if she knew the whereabouts of father, she said she did not, and had not seen him since that day at 4:00 p.m. The police requested that mother meet them at the home; mother refused, said she would meet at a Starbucks, and hung up the phone.

After the police met mother in Santa Clara and transported her to the home, she told the police there had been no incident. Mother stated that the minor had run away from home before "and was a 'liar.' " She made these statements about the minor repeatedly while she ignored questions by the police. Mother told the police "she was never going to forgive her daughter." She also denied that there were any firearms in the residence. When the police asked mother again if she knew of father's whereabouts, she said that—contrary to her earlier statement to the police that she had last seen father that day at 4:00 p.m.—the two of them had had dinner together at a restaurant. She said they had returned home to San Jose[5] and were told by the paternal grandmother that the minor was missing. Mother stated that she had then gone looking for the minor in her car, while father left the house on foot to look for the minor.

The police observed that mother was bleeding from her head. When they asked how she had received her head injury, mother was uncooperative and rapidly moved her head to prevent the police from observing the injury. She told one officer that she had bumped her head exiting her car. Mother was handcuffed by the police due to her

---

[5] There is some lack of clarity as to the living circumstances of mother at the time of the January 20 incident. At the contested jurisdiction/disposition hearing on July 22, mother testified that she had "always" lived with her parents in Santa Clara, and that she only occasionally stayed with father in San Jose at the paternal grandparents' home. She denied other testimony that she lived in the paternal grandparents' home. Social worker Dawn MacDonald-Vargas, however, testified that both the minor and her older brother, J.N., told the social worker that mother lived with father at his parents' home in San Jose. And the maternal grandmother told the social worker that mother was not living with her in Santa Clara at the time of the January 20 incident.

creating an unsafe environment while police were attempting to enter the home to perform a welfare check on the paternal grandfather. The concern of the police was that mother, who refused to put her phone down, may have been texting father (whom the police considered armed and dangerous) to alert him about police movements. The police arrested mother for child endangerment (Pen. Code, § 273a, subd. (a)).

The minor told the police that father owned an AR-15, a .44 Magnum, and a stainless-steel semiautomatic handgun. The minor said that she had observed the firearms frequently, and father had often talked about the guns being present in the home. The minor also said that father left live ammunition on the floor inside the house, and that she was afraid of him.

The homeowner (paternal grandfather) consented to a police search of the home. Police located ammunition for a .44 Magnum, a rifle (found in the minor's sock), and a magazine (found under father's mattress). The minor told the police that she collected ammunition around the house to prevent father's having access to it. She also pointed out a bullet hole in the ceiling which she stated was caused by father's accidental discharge of a rifle two months earlier. Police found no guns at the home. The minor told the police that she believed father had removed the guns when he left the house "because he 'knew the police were coming.' "

One anonymous witness told the police that the witness heard a female "yell 'Call 9-1-1' and then heard a scream." That witness saw two females and a man "talking/arguing outside the residence." The witness believed that the people left in a black car.

Another anonymous witness reported to the police that the witness heard a gunshot and a woman scream. That witness heard the woman telling " '[father's forename]' to 'get in the car' and [asking] 'where did she go?' "

The police also reported that the living conditions in the home were unsanitary. There was mold on the refrigerator and kitchen area, flies, and a smell throughout the

house of feces and urine. There were items strewn on the floor that made it difficult to move around the house.

### 3. *Department Interviews*

#### a. **The Minor**

Social worker Dawn MacDonald-Vargas interviewed the minor on January 22. The minor said that on the evening of January 20, she was at the home of the paternal grandparents when "father 'ran into the house, and shot once and ran back out.' " The minor told the social worker that father then came back inside, cocked the gun, and then " 'hit [mother] on the head with a closed fist." The minor called the police to report the incident, and mother told the minor that she " '[will] never forgive [her] for this. I hate you.' " The minor told the social worker that her parents gathered the guns in the house, mother called father's name, and she took him away to prevent him from being arrested. The minor then left the home and went to a nearby alley. The minor told the social worker that she felt mother would " 'rather leave [her] out in San Jose alone at night, in the alley where two people were just shot, instead of [her] dad going to jail.' "

The minor told the social worker that her parents' relationship was " 'toxic' and 'they should not be together.' " She said that father often broke things for no reason when he was angry, and his assaultive behavior was " '[a]lways the same.' " After each episode of domestic violence, "mother acted like nothing happened."

The minor described to the social worker two prior instances of violent behavior by father. In the spring of 2019 in San Francisco, father repeatedly punched mother in the head and face, causing her to bleed. Afterward, "father grabbed the [minor's] hoodie from behind and pulled her forcibly back into the car so that she would not leave." Mother falsely reported to the police that she had been assaulted by three teenagers.

In another incident in or about September 2019, father, after drinking, drove mother and the minor to pick up her brother, J.N. When they arrived to pick up J.N., the parents began to argue, father punched mother, and she struck him back. J.N. noticed

8

that both parents were bleeding, and father threatened J.N., telling him that he would " 'rape' " him if he called law enforcement. The minor told the social worker about father's threat; she said, " 'I thought at that moment, what happened to you [the father] in prison? What kind of person are you?' " When they arrived home, mother served father more alcohol. He tried to grab the minor's cell phone, and when she refused, he tried to strike her, she fell, and he landed on top of her. J.N. intervened, grabbing a knife, and pushed father off of the minor. Father then grabbed J.N.'s hand that held the knife and punched J.N. repeatedly. The minor attempted to protect her brother by kicking father in the groin and hitting him on the head with a wrench. "[F]ather then began to 'attack' her," and J.N. broke a lamp over father's head. Mother intervened by striking father in the ribs with a bag containing a six-pack of beer. The minor said that after this assault, she and her brother "had their father's blood 'all over them.' " The minor described to social worker MacDonald-Vargas the intensity of father's attack on J.N., stating that "she still remember[ed] the sound of the father's punches landing on the sibling, and began to tear up as she stated, 'J.N. was in a protective stance' . . . and . . . the sibling [had] disclosed to her that he experience[d] intrusion or flashbacks of the incident."

The minor "described her relationship with her mother as distant." She told social worker MacDonald-Vargas that mother was " 'always in a bad mood,' " and she was constantly in a bad mood for the three years that father was incarcerated. This impacted the minor's mental health when she was nine; "she became depressed and began to engage in self-injurious behaviors," namely, " 'cutting.' " The minor indicated that mother was inattentive and did not notice the self-harming but was told about it by an acquaintance from church.[6]

---

[6] The Department assessed the minor as being "an extraordinarily insightful and empathetic child" who was "resolute and unwavering in her disclosures."

9

### b. Mother

During an interview at the Department's offices on January 22, mother denied all allegations in the petition, including ongoing domestic violence or violence in the children's presence. The social worker observed that "mother used the interview time to [say] that 'she loves her children, always puts them first and would do anything for them' and blamed [the minor] for bringing her family to the attention of law enforcement and the Department." Mother told the social worker repeatedly that she was " 'shocked' " that the minor would report that there had been domestic violence in the home, and she stated that " 'we . . . have such a close relationship.' "

Mother denied that there was a domestic violence incident on January 20. Mother said she and father had gone out to dinner and were not home at the time of the alleged incident. In response to the Department's question about reports by the minor and neighbors about gunshots at the home that evening, mother said that the minor had been jealous of the parents' going out for dinner rather than mother taking her to the mall as mother had promised. Mother stated further that her neighbors didn't like them. She also denied that father had caused the injury to her head, saying that she had hit her head on the door of her car because "she was in a rush to find [the minor] after law enforcement informed her [the minor] was safe at home." The social worker commented in the report that when mother discussed the injury, she "pointed above her temple where there was no visible mark. Police photos . . . indicate the wound was not located above her temple."

Mother denied that she had blamed the minor for intervening on January 20 or that she had told the minor, " 'I'll never forgive you for this. I hate you.' " She said the minor "runs away to be with her boyfriend" and "has "emotional problems and behavioral issues in the home and at school." Mother stated that she knew about the minor's past self-harming behavior and mother had taken her out of school and home-schooled her for a year. She said that the minor had not received counseling at that time.

Mother also denied any knowledge of prior child welfare referrals. She acknowledged that she had obtained a restraining order in 2003 against father, and that he had been ordered by the court to take anger management classes. She said more recently, father sometimes would "yell, but . . . not physically assault her." Mother denied that father possessed firearms and ammunition in the home, but she "evaded questions" on the subject and could not explain the presence of ammunition at, and the existence of a bullet hole in the ceiling of, the residence.

Mother ended her meeting with the Department early due to another appointment. She did not make herself available to the Department for a follow-up interview.[7]

### c.     Father

Although father answered questions concerning paternity, he refused an interview by the social worker because he believed he would be arrested if he came to the Department's offices. He did not make himself available later for an interview.

### d.     Minor's Brother, J.N.

The minor's brother, J.N., was interviewed by the Department on January 24. He was not home on the evening of January 20. J.N. said he did not know about domestic violence between his parents, but he said it could have occurred on weekends when he stayed with the maternal grandparents. He told the Department he did not believe that his sister, the minor, would lie about domestic violence.

---

[7] The Department's assessment concerning mother was that she "has repeatedly professed her love for [the minor], despite lack of follow[-]through and has asserted that they have a close relationship, which [the minor] denies. The mother's persistent, fixed denial and minimizations of the ongoing violence in the home, blame and shaming of the child and self-focus, have rendered her audible claims null and void. The mother has demonstrated that she cannot get past her own hurt to attend to the hurt of her child, exemplified by expressing grief attached to her own pain when [the minor] did not request to be back in her mother's care and when she refused to see her. In each example, the mother has attended to her own hurt and has not questioned or addressed the hurt of her child."

### C. Jurisdiction/Disposition Addendum Reports

#### 1. February 26, 2020 Addendum Report

In an addendum report dated February 26, the Department reported that the minor had her first supervised visit with mother on February 20; prior to that time, the minor had refused any visits, "indicating that she was not ready to have any interactions or communications with [mother]." Mother was appropriate during the visit and the minor's "emotional engagement with the mother was positive, though measured."

The Department reported that a CFT (Child and Family Team) meeting took place on February 21. The social worker stated in the report that the three-hour meeting had been unproductive, indicating that "mother [had] demonstrated an egregious lack of insight into the serious nature of the case, exampled when she asked this worker to explain why her child was removed from her care and when she did not appreciate the explanation, indicated . . . she believed this worker did not do a thorough investigation. Further, the mother denied the allegations before the Court, in fact dismissing them as hearsay." Mother denied that there was any domestic violence in the home. Regarding the January 20 incident, mother told the case worker variously, " 'We were not even home at the time this . . . was supposed to have happened'; '[the minor] wasn't even in the room when it happened'[;] and '[the minor] wasn't in the house when it happened.' "

Social worker MacDonald-Vargas advised in the report that she was "concerned about undue pressure being placed on the [minor] by her siblings, who have been supplying the mother with information regarding the child. The child has vacillated in her opinion on placement and visits. This vacillation coincides with information fed to the child by her sibling and her mother's friend which indicate that if the child is not returned to the mother's care, the mother will move out of state and the mother will give away the child's pet."

The Department was advised that father had turned himself in to authorities in Colorado, and he had been extradited to Santa Clara County on January 24. Father's

parole agent advised the social worker that father was on parole from a 2016 felony conviction of assault with a deadly weapon (Pen. Code, § 245, subd. (a)(1)), with a great bodily injury enhancement (Pen. Code, § 243, subd. (d)). With respect to the January 20 incident, criminal charges were pending against father that included assault with a deadly weapon (Pen. Code, § 245, subd. (a)(1)), possession of ammunition by a felon (Pen. Code, § 30305, subd. (a)(1)), child endangerment (Pen. Code, § 273a, subd. (a)), domestic violence (Pen. Code, § 273.5, subd. (a)), and brandishing a weapon (Pen. Code, § 417, subd. (a)(2)). The parole agent advised the Department that father would receive long-term incarceration if he were convicted of any of the pending charges.

The Department recommended that mother receive reunification services; additionally, it recommended that she receive a psychological assessment to determine the services that would best enable her to reunify with the minor. The Department recommended that services for father be bypassed.

### 2.     July 21, 2020 Addendum Report

In a July 21 addendum report, the Department advised that the minor had had four placements since her removal, three of which having failed due to her "engag[ing] in self-sabotaging." The case worker explained that "[t]he child presents with a pattern of behaviors that include absconding, . . . defiance, volatility, coercion and emotional dysregulation, evidenced by dissociation, assaultive behaviors, . . . [and] engag[ing] in self-isolation, so much so she refuses to eat or leave her room for extended periods of time."

The Department reported that the minor was engaged and was actively participating in her case planning and plan. The social worker advised that in April, Dr. Marlene Storm, the medical director of the Santa Clara Valley Health and Hospital System, indicated "that the child presents with symptoms of a personality disorder . . . [and that] the need for a psychological evaluation was urgent." Dr. Sturm "strongly

13

recommend[ed] focused intervention to address [the minor's] mental health issues." Mental health services for the minor had been delayed, however, due to difficulties with obtaining consent from mother for treatment, and shelter-in-place orders resulting from the COVID-19 global pandemic. The minor was scheduled for a psychological evaluation on July 10.

### D. Motion to Quash/Jurisdiction-Disposition Hearing (July 2020)

The juvenile court originally set the jurisdiction/disposition hearing for February 14. The hearing was postponed multiple times, initially because mother had requested a contested hearing, and thereafter because of shelter-in-place and emergency orders related to the COVID-19 global pandemic. The contested hearing took place on July 20 and 22. Prior to that contested hearing, the motion to quash that is the subject of this appeal was presented and decided by the juvenile court.

#### 1. Motion to Quash

##### a. Motion

Mother filed a witness list on February 26 that included the minor as a witness to be called at the contested hearing.[8] Subsequently, mother filed a list on May 20, identifying the minor as a witness for "cross-examination regarding her allegations as stated in the petition and the report. [This requires the service of a subpoena, which has not been completed at this date.]"

On July 1, 2020, the minor's counsel filed a motion to quash the subpoena that required the minor to testify at the jurisdiction/disposition hearing. The motion sought an order that the minor not be compelled to testify, or, in the alternative, that her testimony be given in chambers out of the presence of the parties. The motion was accompanied by

---

[8] We note that at a hearing less than two weeks earlier, mother's counsel advised the court that the minor was not on the witness list, and that having the minor called as a witness was not "something that [mother] want[ed] to put her daughter through."

14

a declaration, filed by the Department, of the assigned social worker MacDonald-Vargas. The minor's counsel took the position in the motion that "[i]t is not in [the minor's] best interests to testify because of the high probability that testifying will be psychologically and emotionally harmful." Citing *In re Jennifer J.* (1992) 8 Cal.App.4th 1080 (*Jennifer J.*), minor's counsel asserted that the court had the discretion to exclude the testimony of a child witness if necessary to avoid psychological harm to the child. Counsel argued that the minor's statements concerning the allegations in the petition were available in the Department's reports, which were admissible hearsay and to which no objection on the ground of admissibility had been asserted.

Social worker MacDonald-Vargas, who received a Master's Degree in Clinical Social Work in 2017,[9] declared that the minor had "been exposed to chronic high lethality domestic violence" in which father was the aggressor. Father had physically assaulted the minor in the past, and mother had "emotionally abused [the minor] by protecting father, minimizing and denying the extent of the abuse, and blaming [the minor] for seeking help."

Social worker MacDonald-Vargas assessed that the minor had "suffered serious emotional damage as a result of her parents' conduct," and she "remain[ed] emotionally fragile." The social worker opined that "[the minor] presents with emotional dysregulation consistent with trauma exposures, both pervasive due to domestic violence in the home and acute due to the high lethality incident that led to her removal. [The minor] presents traits and behaviors akin to personality disorder. [The minor] has been suspended from school for fighting with a peer. She has experienced suicidal ideations. She has engaged in volatile interactions with family care providers." The social worker stated that the minor's "trauma ha[d] not been addressed." The minor had not yet begun

---

[9] At the later jurisdiction/disposition hearing, the juvenile court ruled that social worker MacDonald-Vargas was qualified to testify as an expert in the area of "risk assessment and placement of dependent children."

15

receiving mental health services, which delay was due to both the COVID-19 pandemic and "the parents' reluctance to sign mental health authorizations."

Social worker MacDonald-Vargas declared further that when she discussed the case with the minor, she "presents as emotional[,] evidenced by crying and intermittent disassociation. When recounting the events of January 20, 2020, [the minor] cries and reports that she cannot get 'this' out of her head. [The minor] has expressed fear and concern for her mother's wellbeing upon learning that her father was released from jail." The social worker indicated that the minor's emotional stability had been impacted during the dependency due to mother's consistent unauthorized contacts with the minor (cell phone, social media, and intermediaries) outside of supervised visitation. After these contacts, the minor's "demeanor and behaviors [would] change dramatically. [The minor] becomes easily agitated, defensive, and acrimonious toward her foster family and the professionals involved in her life."

Social worker MacDonald-Vargas opined that "[i]f forced to testify in this matter, [the minor] would be in jeopardy of emotional and physical decompensation given her past self-injurious behaviors and recent suicidal ideation. For the sake of her emotional wellbeing, it is imperative that [the minor's] parents believe her and demonstrate empathy. Unfortunately, that has not happened. Instead, [the minor] is under enormous pressure to corroborate her mother's denials and misrepresentations, to validate her mother at the expense of herself, and to do what she believes is necessary to protect both herself and her mother from further abuse by her father. [The minor] is highly susceptible to unspoken coercion and is vulnerable to further emotional damage if she is required to retell her trauma narrative."

### b. Opposition to Motion

A trial management conference was scheduled for July 8; it was anticipated that argument would be heard on the minor's motion to quash at that time. No opposition to the motion was submitted by mother prior to July 8. The argument on the motion was not

heard that day, due to the illness of one of the attorneys. Instead, the court provided a deadline of July 10 for submission of papers concerning the motion, and it indicated it would then rule on the papers submitted.

Mother opposed the motion to quash in papers filed on July 10. Mother's opposition was not accompanied by a declaration. She argued that there is no automatic disqualification of a child's testimony in a dependency proceeding. To the contrary, mother argued, section 350, subdivision (b) anticipates the need for a child's testimony and contains procedures, such as in-chambers testimony, that may limit the negative emotional impact upon a child in giving testimony. She asserted that the motion and supporting declaration contained conclusory, unsupported statements about the negative impact upon the minor that would result if she were compelled to give testimony.

### c. Order on Motion to Quash

In an order dated July 10 and filed July 13, the juvenile court granted the minor's motion to quash. The court considered the possibility that by testifying remotely, the minor could provide testimony without having to see or hear her parents. But it found "under the unique facts of this case, . . . that even the use of remote testimony is not sufficient to protect [the minor] from psychological harm." The court recited a number of matters relevant to its decision, including that the allegations in the petition involved "very serious, high lethality domestic violence" which was reported to the police by the minor herself; the parents' subsequent concerning behaviors, including mother's having blamed the minor; the pressures reportedly facing the minor to corroborate mother's account of the events leading to the removal; and the high level of emotional risk associated with the minor's prospective compelled testimony. The court concluded: "It is not in [the minor's] best interests to testify due to the high probability that testifying—even remotely—will be psychologically and emotionally damaging to her. [The minor's] statements are readily available in the social worker's report."

17

## 2. *Jurisdiction/Disposition Hearing*

The juvenile court conducted a combined, contested jurisdiction and disposition hearing on four days between July 20 and August 24. The court heard two days of testimony on July 20 and 22 from two witnesses, social worker MacDonald-Vargas and mother. Mother testified at length concerning her account of the events of January 20. Social worker MacDonald-Vargas also provided testimony as to the minor's account of the January 20 incident.[10] Counsel for the Department, mother, father, and the minor thereafter submitted written closing arguments.

On August 24, the juvenile court found the allegations under subdivisions (a) and (b)(1), and (c) of section 300 as alleged in the petition true, and it adjudicated the minor a dependent child of the court. The court struck the allegations under section 300, subdivision (i) alleged in the petition. It found by clear and convincing evidence that the minor's welfare required that the minor be removed from the physical custody, care, and control of the parents. The court ordered reunification services for mother, and it ordered services for father bypassed. In reaching its conclusions, the juvenile court found the testimony of social worker MacDonald-Vargas "to be credible and detailed." The juvenile court judge also concluded that mother's testimony was not credible, noting that "in order to believe [mother's testimony], I would have to believe that pretty much everybody else is lying."

Mother filed a timely appeal from the juvenile court's August 24 order after the jurisdiction/disposition hearing and the August 13 order granting the motion to quash.

---

[10] Social worker MacDonald-Vargas testified that the minor never recanted her account of what had transpired on January 20.

## II.    DISCUSSION

### A.    Applicable Law

As was recently explained by the First District Court of Appeal (Division One), " 'Parents have a fundamental liberty interest in the care, custody, and management of their children.' [Citation.]  Unlike a criminal defendant, a parent in a dependency proceeding does not have a right 'to full confrontation and cross-examination' under the Sixth Amendment of the federal Constitution or article I, section 15 of the California Constitution.  [Citations.]  A parent does, however, have 'a due process right to a meaningful hearing with the opportunity to present evidence,' including a right to confrontation and cross-examination of witnesses.  [Citations.]" (*In re Daniela G.* (2018) 23 Cal.App.5th 1083, 1092 (*Daniela G.*).)

Section 341 provides: "Upon request of the social worker, district attorney, the child, or the child's parent, guardian, or custodian, or on the court's own motion, the court or the clerk of the court, or an attorney, pursuant to Section 1985 of the Code of Civil Procedure, shall issue subpoenas requiring attendance and testimony of witnesses and production of papers at any hearing regarding a child who is alleged or determined by the court to be a person described by Section 300."  (See also Cal. Rules of Court, rule 5.526(d)) [clerk's issuance of subpoenas on court's motion or request of agency, parent, child, or caregiver].)

In the instance of a child witness in a dependency proceeding, the juvenile court is empowered to "control all proceedings during the hearings with a view to the expeditious and effective ascertainment of the jurisdictional facts and the ascertainment of all information relative to the present condition and future welfare of the person upon whose behalf the petition is brought."  (§ 350, subd. (a)(1).)  In that regard, the court, may order a minor's testimony to be given in chambers outside the presence of the parents and with their counsel present, if it finds "(1) . . . testimony in chambers is necessary to ensure truthful testimony[; ¶] (2) [t]he minor is likely to be intimidated by a formal courtroom

19

setting[; or ¶] (3) [t]he minor is afraid to testify in front of his or her parent or parents." (*Id.*, subd. (b).)

Notwithstanding a parent's rights to confront and cross-examine witnesses and to subpoena witnesses under section 341, the juvenile court in an appropriate case may refuse to require a child who is the subject of the proceeding to testify as a witness. (*Jennifer J.*, *supra*, 8 Cal.App.4th at p. 1089.) As the *Jennifer J.* court explained, "This power derives . . . from a recognition of the overriding objective of the dependency hearing—to preserve and promote the best interests of the child. It would be a perversion of the procedure to impose upon it a requirement that the child's testimony *always* be presented, regardless of the trauma resulting to the child therefrom, and regardless of the necessity of such testimony in the resolution of the issues before the court." (*Ibid.*, fn. omitted.) The juvenile court, "in considering whether to exclude a child's testimony, . . . must engage in "a careful weighing of the interests involved," including a parent's right to call and cross-examine witnesses. [Citations.]" (*Daniela G.*, *supra*, 23 Cal.App.5th at p. 1092, quoting *Jennifer J.*, *supra*, at p. 1086; see also *Maricela C. v. Superior Court* (1998) 66 Cal.App.4th 1138, 1146 ["[d]ue process requires a balance"].) Although the decision in *Jennifer J.* involved testimony at a selection and implementation hearing under section 366.26, the principle that the court may exclude a child's testimony in an appropriate case has been "explicitly extended" to jurisdiction and disposition hearings. (*Daniela G.*, *supra*, at p. 1087.)

## B. Standard of Review

"[A] juvenile court has discretion to refuse to require a child to testify . . . if the material effect of the child's testimony on the relevant issues is outweighed by the psychological injury the child risks by testifying. [Citation.]" (*Daniela G.*, *supra*, 23 Cal.App.5th at p. 1091.) Thus, an order excluding a child's testimony based upon the avoidance of psychological harm is reviewed for abuse of discretion. (*Id.* at p. 1090.) "To the extent [the appellant] challenges the factual findings underlying the juvenile

court's ruling, our review is for substantial evidence, and to the extent his [or her] claims raise questions of law, our review is de novo. [Citation.]" (*Ibid.*)

## C. No Error in Granting Motion to Quash[11]

Mother challenges the juvenile court's order granting the motion to quash, claiming that the court abused its discretion in violation of her due process rights to confront and cross-examine witnesses. She asserts that the court did not properly consider the need for the minor's testimony at the contested hearing when it found that there was a likelihood that her compelled testimony would cause her psychological and emotional harm. We will now address in detail mother's contentions.[12]

---

[11] Mother's counsel in her opening brief addresses an issue of the potential mootness of this appeal. (The minor, in her appellate brief, does not address this issue.) Mother asserts that since the making of the jurisdictional finding below, the juvenile court ordered the minor returned to mother, and it terminated jurisdiction. In support of this assertion, counsel refers to her declaration attached to the brief, in which she states she was informed by her client that the juvenile court made these orders on September 27, 2021. Counsel stated further that she had inquired of the court but was advised that certified orders relating to the termination had not yet been prepared. Counsel advised that upon receipt of the certified records, a motion to augment would be filed. No such motion was filed in this case, and the issue was not addressed in the reply brief filed four months later. There is thus nothing before this court to consider concerning the potential mootness of this appeal. Therefore, we need not consider mother's argument, citing *In re Daisy H.* (2011) 192 Cal.App.4th 713, 716, that the claimed subsequent termination of jurisdiction did not render the appeal moot.

[12] Mother's notice of appeal reflects a challenge to both the juvenile court's August 24 order after jurisdiction/disposition hearing and its July 13 order granting the minor's motion to quash. Mother's position in her appellate briefs is solely that the court erred in granting the motion to quash. She makes no specific argument concerning alleged error at the jurisdiction/disposition hearing. Rather, her position is that the order after the jurisdiction/disposition hearing must be reversed because the court erred in precluding the minor from testifying. Therefore, to the extent that mother may claim error in connection with the order after the jurisdiction/disposition hearing independent of her claim that the motion to quash should have been denied, she has abandoned any such claim. (*Tanner v. Tanner* (1997) 57 Cal.App.4th 419, 422, fn. 2 [appellate court may treat as partial abandonment of appeal where appellant fails to challenge in opening brief an order specified in notice of appeal].)

We observe initially that mother's opposition to the motion filed in the juvenile court was, at best, cursory. Mother presented no facts through a separate declaration. She cited no case authority, did not argue that her due process rights would be infringed if the motion were granted, and did not respond to the motion's central position that the juvenile court had the authority under *Jennifer J.,* supra, 8 Cal.App.4th 1080 to exclude the testimony of a child if necessary to prevent the child from sustaining emotional harm. Mother argued that the motion and supporting declaration contained "broad, sweeping generalizations and conclusions" without factual support that compelling the minor's testimony would have a negative impact on the child. Aside from this conclusory argument, mother's opposition did not address the specifics contained in social worker MacDonald-Vargas's declaration regarding the minor's circumstances and her existing psychological and emotional condition. And mother did not address at all why the minor's testimony at the hearing was necessary and what mother hoped to accomplish by compelling her daughter to testify besides repeating her account of the January 20 incident as provided in detail in the Department's reports. This latter omission in mother's opposition is significant, since the focal point of her appellate briefs is her claim that the juvenile court did not adequately consider the necessity of the minor's testimony.

Mother asserts that the court failed to conduct the requisite balancing of the need for the minor's testimony against the risk that requiring the minor 's testimony would result in psychological harm. In making this assertion in her opening brief, she argues that the juvenile court made no findings concerning the necessity of the minor's testimony, suggesting it was error not to do so. Elsewhere in her opening brief, mother reiterates that the juvenile court abused its discretion because it did not "consider the materiality of [the minor's] potential testimony," "failed to consider the importance of [the minor's] credibility," and "failed to conduct the required balancing test." The suggestion from mother's arguments is that the juvenile court erred (1) by failing to make

express findings in granting the motion to quash; and (2) by not appreciating or applying the law in reaching its decision. Both contentions lack merit.

First, mother cites no authority, and we are aware of none, that imposes an obligation on the court to make specific findings in granting or denying a motion to quash. (See *McDermott Will & Emery LLP v. Superior Court* (2017) 10 Cal.App.5th 1083, 1103 [trial court not required to make findings in support of its ruling on applicability of attorney-client privilege, and appellate court would "infer[] it made all favorable findings that are supported by substantial evidence"]; see also *In re A.L.* (2022) 73 Cal.App.5th 1131, 1156 [no requirement that juvenile court issue findings in denying claim of parental benefit exception to adoption].)[13] Thus, we infer that the juvenile court impliedly found that, balancing the necessity of the minor's testimony against the likelihood that compelling her testimony would cause her emotional harm, an order precluding the minor from testifying in order to protect her from emotional harm was necessary.

Second, we will presume that the juvenile court understood and applied existing law relevant to its decision on the motion to quash. "In the absence of evidence to the contrary, we presume that the court 'knows and applies the correct statutory and case law.' [Citations.]" (*People v. Thomas* (2011) 52 Cal.4th 336, 361.) The court stated in its order that it had read and reviewed the minor's motion to quash, the social worker's declaration, and mother's opposition. The motion to quash cited the specific authority—*Jennifer J.*, *supra*, 8 Cal.App.4th 1080, and *Daniela G.*, *supra*, 23 Cal.App.5th 1083—

---

**13** Having said this, we acknowledge that a record containing some detail concerning the trial court's reasoning and findings that have resulted in the order in question is always very helpful to the appellate court. This is no less true, and perhaps more so here, where the decision involves a weighing of two important interests, i.e., the interest of a parent in examining a child witness to the critical events leading to the dependency, and the interests of the dependent child in not having his or her emotional well-being further damaged by being compelled to give testimony.

that discusses the legal principles upon which the juvenile court may exclude the testimony of a minor after weighing the competing concerns. The fact that the juvenile court did not state specifically in its order that it had reached its determination after weighing the need for the minor's testimony against the risk of emotional harm to the minor resulting from that compelled testimony is of no consequence, and it does not demonstrate that the court failed to consider or apply the law.

Mother argues further that the juvenile court did not adequately consider safeguards that could be employed to minimize any potential harm to the minor, such as having her testify in-chambers, or testify remotely with the parents not visible to the witness. This argument ignores the fact that the court, in the penultimate paragraph of the order, specifically found that there was "a high probability that testifying—even remotely—will be psychologically and emotionally damaging to her." In any event, there is no evidence that the juvenile court failed to consider all matters relevant to the motion to quash, including the potential emotional harm to the minor in compelling her to testify, the likely ameliorative effects of having the minor testify in chambers or remotely, and the necessity of the minor's testimony. We will therefore not presume that the court failed to consider the matters relevant to determination of the motion to quash. "Where . . . the record is otherwise silent with respect to what the trial court considered, we must presume it considered all the pertinent matters presented to it and ruled in favor of the prevailing party." (*Lydig Construction, Inc. v. Martinez Steel Corp.* (2015) 234 Cal.App.4th 937, 945.)

The juvenile court below recited significant factors relevant to its determination that precluding the minor's testimony was proper. After acknowledging it could order that the minor testify remotely so that she would not need to see or hear her parents, the court stated that "under the unique facts of this case, the court finds that even the use of remote testimony is not sufficient to protect [the minor] from psychological harm." It identified those facts as "includ[ing] the following: [The minor] is relatively young (age

24

12).  The [petition's] allegations . . . detail very serious, high lethality domestic violence, and in fact, [the minor] was the reporting party who called law enforcement. . . .  [T]he parents' [reported] behaviors subsequent to [the minor's] removal cause the court great concern: father fled, was arrested out of state, and was extradited back to California where he is facing serious criminal charges; mother blamed [the minor], threatened to give away her pet bearded dragon, and told [the minor] she would move out of state if [the minor] does not come home.  According to the social worker's declaration, [the minor] is under enormous pressure to corroborate and validate her mother, and [the minor] is emotionally fragile and is at risk for emotional and physical decompensation if forced to testify."  The court found social worker MacDonald-Vargas, who had six months of experience working with the family, to be credible.

There were a number of other matters bearing on the question of whether compelled testimony in this proceeding presented a likelihood of emotional harm to the minor that outweighed the need for her testimony.  This included (1) the specifics of the January 20 incident as reported by the minor to the police and to the Department, which specifics included father's, in the minor's presence, subjecting mother to verbal abuse and a physical assault causing her to bleed from the head, and intentionally discharging a firearm in the house; (2) the parents' abandoning the minor unattended to evade law enforcement; (3) corroboration of the January 20 incident from two third-party witnesses; (4) mother's blaming of the minor for reporting the incident, uttering the extremely harmful words that she would never forgive the minor and she hated her; (5) corroboration of mother's blaming the minor, with mother telling the police that she would never forgive her daughter, as well as repeatedly telling the police that the minor was lying and had run away from home previously; (6) mother's giving the police

25

conflicting versions of what had transpired on January 20;[14] (7) the minor's having been present during prior instances of domestic violence between the parents; (8) the minor's having reported that she had been physically assaulted by father on two prior occasions; (9) father's having possessed several firearms and various ammunition in the home, which were accessible to the children; (10) the minor's prior history of self-harming for which she was not treated; (11) social worker MacDonald-Vargas's statements that the minor had (a) been suspended from school for fighting, (b) "experienced suicidal ideations," (c) presented with "traits and behaviors akin to personality disorder," and (d) "engaged in volatile interactions with family care providers"; and (12) the minor's having not yet begun receiving mental health services.

In her appellate briefs, mother discusses at length *Jennifer J.*, *supra*, 8 Cal.App.4th 1080, and *Daniela G.*, *supra*, 23 Cal.App.5th 1083, arguing that the cases compel the conclusion that the juvenile court here erred by granting the motion to quash. The tenor of mother's argument is that the two cases affirming decisions of the juvenile court to exclude child testimony involved circumstances in which the appellant(s)/parent(s) had failed to make a sufficient showing of necessity for the child's testimony. In *Jennifer J.*, the juvenile court accepted the parents' position that the child wished to have further contact with them, was bonded with them, and did not favor adoption, thereby obviating the need for the child's testimony. (*Jennifer J.*, *supra*, at p. 1087.) In *Daniela G.*, in which there was an allegation of sexual abuse by the father of his stepdaughter, the appellate court, inter alia, rejected the father claim that cross-examination of his daughter, Daniela, was essential, concluding that her "testimony would not have helped to resolve any disputed issue. Daniela never said that father had sexually abused her or

---

**14** This included telling the police when initially questioned on the evening of January 20 that she had last seen father at 4:00 p.m. that day, and later the same evening advising police that she had gone to dinner with him and had returned home to find the minor gone.

26

stepdaughter." (*Daniela G.*, *supra*, at p. 1094.) Mother argues that in contrast to these two cases, (1) the juvenile court here did not consider the necessity of the minor's testimony, and (2) because "mother fully disputed [the minor's] version of what happened" and there were inconsistencies in the minor's account, the minor's compelled testimony was essential. We have already addressed the first argument; mother's contention that the court did not weigh the necessity of having the minor testify in arriving at its decision is without merit. As to the second point, mother presented no argument to the court below concerning the need for the minor's compelled testimony. Even acknowledging that there may have existed a greater reason than in *Jennifer J.* and *Daniela G.* for child testimony here, that need for testimony does not *compel* a finding that the juvenile court erred in granting the motion. The court, considering the record before it, properly exercised its discretion by concluding that any need for the minor's testimony was outweighed by "the high probability that testifying . . . [would] be psychologically and emotionally damaging to her."

In *Daniela G.*, appellant-father also challenged the juvenile court's order precluding the testimony of the stepdaughter on the central question of whether he had sexually abused her. (*Daniela G.*, *supra*, 23 Cal.App.5th at pp. 1094-1095.) Although the appellate court "agree[d] that stepdaughter's allegations went to the heart of the case, . . . her testimony would [not] have materially affected the juvenile court's evaluation of the truth of the allegations." (*Id.* at pp. 1094-1095.) The appellate court noted that the stepdaughter had given a detailed account of the abuse to a sexual abuse resource center, and the father, although generally denying the allegations, "did [not] identify any basis on which he hoped to impeach her." (*Id.* at p. 1095.) Here, the minor gave a detailed account to the police and later to the Department, and she never recanted. And mother below did not offer anything substantive in opposition to the motion identifying matters upon which she hoped to impeach her daughter if she were called as a

witness.[15]  Although there were factors existing in *Daniela G.* not present here—such as the fact that the father did not testify, and the court, after considering the stepdaughter's out-of-court statements, found them to be "extremely credible" (*ibid.*)—we are not persuaded by mother's argument that in applying *Daniela G.*, the juvenile court below abused its discretion in granting the motion to quash.[16]

Mother also relies on *In re Amy M.* (1991) 232 Cal.App.3d 849 (*Amy M.*) in support of her claim that the juvenile court erred by precluding the minor's testimony. There, the parents disputed jurisdiction, and competing experts (a court-appointed evaluator and the parents' expert) were presented as to whether the minor had suffered emotional damage that was inflicted by his parents, or alternatively, was a result of the child's removal.  (*Id.* at pp. 864-865.)  The juvenile court judge—after hearing testimony from the court-appointed evaluator that "it would be stressful for [the child] to testify

---

[15] The record is clear that, beyond the fact that mother could contrast her version of the January 20 incident with the minor's, there were some "slight differences in some facts she reported at various times."  The court however, concluded that "there were enough indicia and reliability of corroborating witnesses on the whole, that the Court found [the minor's] account of the events more believable."  These discrepancies, however, do not suggest that the juvenile court was compelled to deny the motion to quash after balancing the relevant factors, including the likelihood of emotional harm resulting from the minor's compelled testimony.

[16] Mother notes that in *Daniela G.*, *supra*, 23 Cal.App.5th at page 1089, the juvenile court deferred its ruling on the motion to exclude the children's testimony until after it conducted an evidentiary hearing, thereby suggesting that the juvenile court in this case erred by ruling on the motion to quash prior to the jurisdiction/disposition hearing. This implicit argument is forfeited because mother did not object below to the court's procedure of deciding the motion to quash before conducting the evidentiary hearing. (See *K.C. Multimedia, Inc. v. Bank of America Technology & Operations, Inc.* (2009) 171 Cal.App.4th 939, 948-949 [appellant forfeited argument challenging court's procedure of dismissing claims through motion in limine by acquiescing to that procedure].)  Mother, in any event, cites no authority in support of such claim of procedural error.  (See *People ex rel. 20th Century Ins. Co. v. Building Permit Consultants, Inc.* (2000) 86 Cal.App.4th 280, 284 [failure to cite legal authority for position in appellate brief "amounts to an abandonment of the issue"].)

because he was under significant psychological stress . . . [and she opined that he] would suffer additional emotional harm if he testified" (*id*. at p. 864)—denied the parents' motion to have the child testify, concluding "that 'I don't think in this case balancing what this child could do or could say versus what the damage to the child. . . . I don't think it makes any sense to have this child [testify].' " (*Ibid.*) A panel of this court found error, concluding that the child's testimony was crucial, because it had the potential to directly verify or refute the expert testimony. (*Id.* at p. 865.) In so concluding, a panel of this court noted that there was no "report containing [the child's] statements which could have substituted for his testimony." (*Ibid.*) Here, there were reports detailing the minor's statements, and the purpose for her prospective testimony was not to verify or refute the opinions of other witnesses. *Amy M.*, which was decided prior to *Jennifer J.*, is distinguishable and does not support mother's claim of error.

Lastly, mother, in seven pages of her reply brief, asserts new arguments that were not (but could have been) raised in her opening brief. Generally, these arguments consist of evidentiary objections to the motion to quash and the accompanying declaration of social worker MacDonald-Vargas, and procedural objections to the manner in which the motion was decided.[17] We will disregard these arguments for two reasons. First, an appellate court "need not consider new issues raised for the first time in a reply brief in

---

[17] The new arguments in mother's reply brief include objections that (1) statements made by the minor's attorney in the motion to quash were not evidence; (2) there were misleading statements in the motion as to matters contained in the social worker's declaration; (3) the minor's counsel did not specifically offer into evidence the Department's reports referenced in the motion and declaration; (4) the minor's counsel never introduced the declaration into evidence; (5) the declaration contained inadmissible hearsay; (6) the procedure of deciding the motion on written submissions rather than through an evidentiary hearing was "unsatisfactory"; (7) opinions offered by the social worker in her declaration were improper because she was not offered or qualified by the court as an expert witness; and (8) the social worker's opinions were not subject to testing through cross-examination at a hearing.

the absence of good cause." (*In re Marriage of Ackerman* (2006) 146 Cal.App.4th 191, 214; see also *Varjabedian v. City of Madera* (1977) 20 Cal.3d 285, 295, fn. 11 ["[o]bvious reasons of fairness militate against consideration of an issue raised initially in the reply brief of an appellant"].)  Second, these evidentiary and procedural objections to the motion and accompanying declaration are forfeited; mother did not assert these objections below, and she may not raise them now on appeal.  " 'An appellate court will ordinarily not consider procedural defects or erroneous rulings, in connection with relief sought or defenses asserted, where an objection could have been but was not presented to the lower court by some appropriate method.' [Citation.]" (*Doers v. Golden Gate Bridge etc. Dist.* (1979) 23 Cal.3d 180, 184-185, fn. 1; see also *Broden v. Marin Humane Society* (1999) 70 Cal.App.4th 1212, 1226, fn. 13 [challenge to sufficiency of declaration not made in trial court forfeited on appeal].)  This forfeiture doctrine applies to dependency appeals and is intended to prevent a party from standing by silently until the conclusion of the proceedings.  (*In re Dakota H.* (2005) 132 Cal.App.4th 212, 221-222.)

The juvenile court concluded that "[i]t is not in [the minor's] best interests to testify due to the high probability that testifying—even remotely—will be psychologically and emotionally damaging to her."  The court, giving "recognition [to] the overriding objective of the dependency hearing . . .to preserve and promote the best interests of the child" (*Jennifer J.*, *supra*, 8 Cal.App.4th at p. 1089), did not abuse its discretion in granting the motion to quash.  Based upon both the matters identified by the court and other factors present in the record, there was substantial evidence supporting the express and implied findings of the juvenile court that excluding the testimony of the minor was appropriate and necessary to protect her from psychological and emotional harm.  (*Daniela G.*, *supra*, 23 Cal.App.5th at p. 1090 ["factual findings underlying juvenile court's ruling" reviewed for substantial evidence].)

## III.    DISPOSITION

The July 13, 2020 order granting motion to quash, and the August 24, 2020 order after the jurisdiction/disposition hearing are affirmed.

_____
BAMATTRE-MANOUKIAN, ACTING P.J.

WE CONCUR:


_____
DANNER, J.


_____
WILSON, J.


*In re M.N.; DFCS v. E.M.*
**H048489**